IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN RE: ) | |
| ) | |
| THE SQUARE AT FALLING RUN, LLC, ) | Case No. 11-bk-753 |
| ) | |
| Debtor. ) | Chapter 7 |
| ) | |

**MEMORANDUM OPINION**

First United Bank & Trust ("First United") seeks entry of an involuntary order for relief against The Square at Falling Run, LLC ("The Square"), under Chapter 7 of the Bankruptcy Code.[1] The Square contends that, among other things, First United filed the involuntary petition in bad faith and that this is only a two-party dispute such that an involuntary order for relief should not be entered.

Based upon the evidence and arguments presented by the parties, the court finds that First United has established grounds for relief under 11 U.S.C. § 303; accordingly, an order for relief will be entered.[2]

---

[1] To the extent that The Square asserts in its post-trial briefing that First United cannot be a petitioning creditor against it because First United is a joint venturer, the court disposed of that argument in connection with First United's motion to dismiss The Square's counterclaim in 11-ap-60. By order dated September 30, 2011, the court found that The Square failed to state a cause of action against First United based on joint venture where the record reflected that the two parties had nothing more than a lender-borrower relationship. Thus, the court will not substantively address the same argument here.

[2] The court will not address substantively the $14,425.00 minimum threshold or the "generally not paying" factors because those elements of 11 U.S.C. § 303(b) and (h) are not disputed by The Square in its answer to the involuntary petition.

1

## I. BACKGROUND

On December 19, 2008, several entities controlled by common principals borrowed $2.48 million from First United on a non-revolving line of credit. The Square, which also shares principals common to the Borrowing Entities,[3] guaranteed the Borrowing Entities' indebtedness to First United. By signing the December 19, 2008 Commercial Guaranty (the "Guaranty"), The Square obligated itself to the performance and prompt payment, upon request, of all indebtedness when due, whether at maturity or earlier. To secure The Square's performance of the Guaranty, First United took a credit line leasehold deed of trust on The Square's leasehold interest in the April 17, 2008 Ground Lease (the "Ground Lease") executed by the City of Morgantown Building Commission (the "City"), as lessor, and The Square and McCoy 6 Apartments, Limited Liability Company ("McCoy 6"), as lessees. The Ground Lease required, in part, that The Square and McCoy 6 build a parking structure on the leased property by April 1, 2011.

The Borrowing Entities defaulted on the note owed to First United. Subsequently, First United filed a complaint against The Square in the District Court for the Northern District of West Virginia (Case No. 1:11-cv-31) on March 18, 2011, alleging The Square's default on the December 19, 2008 loan agreement and Guaranty, demanding damages flowing from the default, and seeking the appointment of a receiver to take control of The Square's assets and operations.[4] While the district court litigation was proceeding, however, the City sent all interested parties notice of its intent to terminate the lease with The Square based on The Square's failure to complete the contemplated parking structure on the leased property by the April 1, 2011 deadline. First United's

---

[3] The Borrowing Entities are McCoy 6 Apartments, Limited Liability Company; Augusta Apartments, LLC; Grand Central Building Limited Liability Company of Morgantown; New Creek, LLC; and Battle Hill, LLC. McCoy 6 Apartments, Augusta Apartments, and Grand Central Building are each being administered by a common trustee under Chapter 11 of the Bankruptcy Code.

[4] The Square's only apparent asset is its interest in the Ground Lease. While under The Square's control, the Ground Lease generated monthly income of approximately $7,500, which The Square's principals used to pay living expenses. After the filing of the involuntary petition and the appointment of an interim Chapter 7 trustee, monthly operating reports filed by the interim trustee suggest that The Square's leasehold interest in the Ground Lease has generated substantially more monthly income; albeit at the sufferance of the City given the ostensible expiration of the Ground Lease.

2

receipt of the City's notice of termination precipitated its decision to file this involuntary petition against The Square.[5]

## II. DISCUSSION

First United asserts that the court should enter an involuntary order for relief against The Square because (1) it holds a non-contingent claim of $2.48 million that is not the subject of a bona fide dispute as to liability or amount; (2) its claim is at least $14,425.00 more than the value of any lien on The Square's property securing its claim; (3) The Square has fewer than 12 creditors;[6] and (4) The Square is generally not paying its debts as they become due.

The Square asserts that First United's claim is contingent and is the subject of a bona fide dispute, First United is its only creditor causing this case to be only a two-party dispute, and First United filed the involuntary petition in bad faith.

**1.    Not Contingent as to Liability**

Without directing the court to any specific language in the Guaranty — in fact, the court finds none — The Square asserts that First United's claim is contingent and the subject of a bona fide dispute on the grounds that the December 19, 2008 Guaranty was contingent upon the building of

---

[5] On April 25, 2011, First United filed this involuntary case. In an effort to dispose of the matter with dispatch, the court, after disposing of several preliminary matters and allowing for a period of discovery, held a December 15, 2011 evidentiary hearing on the contested involuntary petition, and took the matter under advisement after receiving post-trial briefing. Subsequently, counsel for First United interrupted the court's January 6, 2012 Chapter 13 docket in Martinsburg, WV, and represented to the court that all parties agreed to stay proceedings in the case in favor of settlement discussions. As a result, the court ceased further work upon its opinion.

On January 10, 2012, a joint stipulated order staying the case and setting a March 1, 2012 telephonic status conference was entered by the court. At the March 1, 2012 status conference, it was clear that some, but not all, of the parties had engaged in negotiations and were optimistic about settlement. The Square, however, had not been included in those negotiations, and some parties expressed concern that a decision on the involuntary petition might be the best use of judicial resources. At the request of the parties, however, the court continued the status conference for one week to allow the parties to confer in that regard, at which time all of the parties were in agreement that a decision on the involuntary petition was needed. Thus, the court is now ruling on the involuntary petition a year after its filing.

[6] The court will not address substantively the numerosity requirement of § 303(b), because it is undisputed that The Square has fewer than twelve creditors.

3

a parking facility on the property leased from the City.  The Square further asserts that, pursuant to the terms of its lease with the City, its leasehold interest in the property upon which the parking facility was to be built could not be encumbered except for the purpose of building the parking facility.  Thus, The Square asserts that because the loan it guaranteed was a "workout loan," which was not made for the construction of a parking facility, First United's secured interest in the leasehold property is subject to bona fide dispute.

The initial burden rests on the petitioning creditors to establish a prima facie case that their claims are not contingent and that no bona fide dispute exists regarding such claims.  *In re Tucker*, No. 5:09-bk-914, 2010 WL 4823917, at *3 (Bankr. N.D.W. Va. Nov. 22, 2010) (citing *Platinum Fin. Servs. Corp. v. Byrd (In re Byrd)*, 357 F.3d 433, 437 (4th Cir. 2004)).  Once the prima facie case is established, the burden then shifts to the debtor to show that the claims are contingent or that a bona fide dispute exists.  *Tucker*, 2010 WL 4823917, at *3.

Section 303(b) of the Bankruptcy Code (the "Code") authorizes the filing of an involuntary Chapter 7 petition by creditors who meet certain qualifications.  To file an involuntary petition against a putative debtor, a creditor must hold a claim that is not "contingent as to liability or the subject of a bona fide dispute as to liability or amount." 11 U.S.C. § 303(b)(1).

The first creditor qualification criterion – not contingent as to liability – is defined by case law.  The following formulation is widely accepted as the standard used for determining whether a claim is contingent under § 303(b):

> [C]laims are contingent as to liability if the debt is one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor and if such triggering event or occurrence was one reasonably contemplated by the debtor at the time the event giving rise to the claim occurred.

*In re All Media Properties, Inc.*, 5 B.R. 126, 133 (Bankr. S.D. Tex. 1980); *see e.g., Holland v. DePaulis (In re DePaulis)*, No. 3:07cv75, 2008 U.S. Dist. LEXIS 74396, at *16-17 (W.D.N.C. Sept. 26, 2008); *Brockenbrough v. Commissioner, IRS*, 61 B.R. 685, 686 (W.D. Va. 1986); *In re Local Communs. Network, Inc.*, No. 07-12433, 2008 Bankr. LEXIS 14, at *8 (Bankr. E.D. Va. Jan. 2, 2008); *In re Gills Creek Parkway Assocs., L.P.*, 194 B.R. 59, 62 (Bankr. D.S.C. 1995); *In re Galaxy Boat Mfg. Co.*, 72 B.R. 200, 203 (Bankr. D.S.C. 1986).

When a petitioning creditor's claim is based upon a putative debtor's guaranty of a primary obligor's performance and payment, the court focuses on whether the guaranty is absolute. *See* 38A C.J.S. *Guaranty* § 79 (2011) ("In general, in the absence of an express provision, the duty of the guarantee to notify the guarantor of a default depends on whether [] the guaranty is absolute."). "A guaranty is deemed to be absolute unless its terms import some condition precedent to the liability of the guarantor." *Esso Standard Oil Co. v. Kelly*, 145 W.Va. 43, 48, 112 S.E.2d 461, 465 (W.Va. 1960). But if a guaranty imposes some affirmative duty upon a petitioning creditor to provide a guarantor with notice of default or demand for payment, the court then focuses on whether such affirmative action was taken. *See In re Vitro Asset Corp., et al.*, No. 11-32600-hdh-11, 2011 WL 1561025, at *3 (Bankr. N.D.Tex. April 21, 2011) ("Because the indentures require a demand on the guarantors and no such demand had been made when the involuntary petitions were filed, . . . the guarantors' obligations were contingent as to liability.").

Here, the following provision contained in the Guaranty evidences that The Square is not an absolute guarantor in that its duty to perform arises only after request or demand by First United: "If Borrower fails to perform or observe any covenants, conditions and agreements required of Borrower . . . the Guarantors shall, *upon request of Lender*, perform such covenant, condition or agreement, including but not limited to prompt payment of the Indebtedness . . . ." Pl.'s Exhibit 7, page 4 (emphasis added). Thus, request or demand for payment is a condition of The Square's liability on the Guaranty. The Square has no duty to act under the terms of the Guaranty until First United requests or demands payment.

The court finds, however, that The Square received the required notice of default and demand for payment from First United upon the filing of the three-count, March 18, 2011 complaint in the district court (Doc. No. 3 in Case No. 1:11-cv-31), which occurred before First United filed this involuntary petition against The Square. As Beverly Sines, Chief Credit Officer at First United, testified, First United brought its district court action against The Square because the Borrowing Entities defaulted on the December 19, 2008 loan, and First United wanted to demand payment from The Square as Guarantor. First United's filed complaint specifically alleges default under the Borrowing Entities' loan agreement and The Square's leasehold deed of trust, and demands

5

judgment against The Square as guarantor in the principal amount of $1,502,087.11.[7] Thus, Count I of the complaint alleging default under the December 19, 2008 loan and demanding payment is a sufficient demand for payment under the Guaranty to make First United's claim noncontingent. *See Cedarbook Plaza, Inc. v. Gottfried*, Civil Action No. 97-1560, 1997 U.S. Dist. LEXIS 8026, at *13 (E.D. Pa. June 4, 1997) (considering the filing of a complaint a demand for payment on a guaranty where the guaranty was silent as to how demand was to be made).

To the extent that The Square also asserts that First United's claim against it as Guarantor is contingent because its obligation to guaranty the indebtedness to First United was contingent upon the building of a parking structure, the purpose of the Guaranty is of no consequence; the fact remains that the indebtedness guaranteed by The Square is due and owing — making the claim noncontingent.[8] *See In re Tucker*, No. 5:09-bk-914, 2010 WL 4823917, at *6 (Bankr. N.D. W.Va. Nov. 22, 2010) (finding the petitioning creditor met its burden in proving its claim was not contingent where the putative debtor guaranteed payment on a note on which the borrowers had defaulted). Moreover, the Guaranty does not contain any language evidencing that The Square's obligation as guarantor to First United was contingent upon the building of the parking structure.

Likewise, the court rejects The Square's assertion that First United's claim is the subject of a bona fide dispute. The Square asserts that there may be some dispute surrounding the propriety of the December 19, 2008 loan and Guaranty. Any assertions in that regard, however, are made in the context of this involuntary case being filed in bad faith and have no impact on the court's determination regarding whether First United's claim is contingent or the subject of a bona fide

---

[7] At the request of The Square and First United, the court takes judicial notice of the district court's docket. Upon review of the district court's docket, the court finds that First United filed its complaint against The Square on March 18, 2011. First United's district court complaint consists of three counts, including an allegation of breach of contract. Without accepting them as true, the court takes judicial notice of the facts alleged in First United's district court action under Fed. R. Evid. 201.

[8] As the district court found on page eleven of its order adopting-in-part the report and recommendation of Magistrate Judge Kaul, "[t]his balance indisputably remains overdue and unpaid."

6

dispute.[9]  Similarly, The Square's assertion that First United's claim is subject to a bona fide dispute because it challenges the secured nature of First United's claim is unpersuasive.  Even if First United were wholly unsecured, it has a claim that is not the subject of a bona fide dispute against The Square based on the Guaranty.

**2.  First United's Good Faith**

The Square asserts that First United filed this involuntary petition against it in bad faith on the grounds that First United contributed to the default on the December 19, 2008 loan, used this filing as a litigation tactic by imposing the automatic stay to forestall the City from terminating its ground lease with The Square, and based on the fact that First United is The Square's only creditor.

Notwithstanding § 303, if requested, a court must determine whether an involuntary petition has been filed in good faith, and must dismiss a bad faith filing.  *United States Optical, Inc. v. Corning, Inc. (In re United States Optical, Inc.*), No. 92-1496, 1993 U.S. App. LEXIS 6960, *9 (4th Cir. April 1, 1993); *Atlas Machine & Iron Works, Inc. v. Bethlehem Steel Corp.*, 986 F.2d 709, 716 (4th Cir. 1993).  "A filing is presumed to be in good faith, and the existence of bad faith must be proven by the debtor by a preponderance of the evidence."  *U.S. Optical*, 1993 U.S. App. LEXIS 6960, at *9.  The Fourth Circuit employs a combined approach to determine whether an involuntary petition has been filed in bad faith: an objective standard that focuses on whether a reasonable person in the position of the creditor would have filed, and a subjective standard that examines the petitioner's motivation.  *Id.*  No single factor is determinative; rather, a court must consider the totality of the circumstances.  *Id.*

Here, the court finds that, aside from presenting no evidence at the evidentiary hearing in this

---

[9] Specifically, The Square asserted facts during the evidentiary hearing regarding alleged fraudulent and improper conduct on the part of First United.  The Square's answer to the involuntary petition, however, contains no assertion of fraudulent conduct.  Upon questioning Beverly Sines on cross-examination about the purpose of the loan, First United objected to The Square raising any affirmative or avoidance defenses during trial because none were pled.  In sustaining the objection, the court permitted The Square's line of questioning only as relevant to a bad faith determination, but cautioned The Square that because no affirmative defenses were raised in its answer, the court would not receive evidence in that regard.  *See* Fed. R. Bankr. P. 1018 (incorporating Fed. R. Bankr. P. 7008, which incorporates Fed. R. Civ. P. 8 requiring affirmative defenses, such as fraud, to be affirmatively pled in answering a contested involuntary petition).

7

matter, The Square's argument and cross-examination of First United's witnesses failed to show bad faith by First United. Objectively speaking, The Square failed to show how invoking the bankruptcy process is not something a reasonable creditor in First United's position would do. Although The Square asserts that it "does not make sense that a party who won its case in district court . . . would then go on and file a bankruptcy to stay enforcement of that Order," the facts of this case lead the court to a different conclusion. First United is the only creditor of The Square that the court is aware of and a secured creditor of several entities related to The Square.[10] The Borrowing Entities and The Square have been engaged in a common development project for some time, with First United being one of the project's principal lenders. McCoy 6, Augusta Apartments, LLC ("Augusta"), and Grand Central Building Limited Liability Company of Morgantown ("Grand Central") each filed for bankruptcy protection, and a common bankruptcy trustee was appointed to administer each of the bankruptcy estates. McCoy 6 and The Square are both lessees to the Ground Lease with the City, and the Chapter 11 bankruptcy estate of McCoy 6 is being administered by a trustee, Robert L. Johns, who is also the gap trustee appointed in this case.

Thus, First United is trying to take advantage of synergies that can be achieved by having the businesses of both entities to the Ground Lease being administered in bankruptcy by a common trustee, and attempting to receive payment according to the bankruptcy priority scheme from any value that may be realized from the common administration of related debtor entities. Such action is an objectively reasonable attempt to maximize potential recovery from the assets of related bankruptcy estates.

Regarding The Square's contention of First United's subjective bad faith, the court finds that First United did not file the involuntary petition with any improper motive or intent directed toward The Square. As Beverly Sines testified to during the evidentiary hearing on this matter, First United filed the involuntary petition upon receiving notice from the City of its intent to terminate the

---

[10] At the evidentiary hearing in this matter, First United attempted to establish that other creditors, primarily taxing authorities, may exist. The record, however, is insufficiently developed for the court to make any finding in that regard.

8

Ground Lease in which First United believes it is secured.[11] The avowed purpose of the bankruptcy filing was to preserve the *status quo* of The Square by imposition of the automatic stay; something that could not be achieved through the receivership process. The court does not find any subjective bad faith by invoking the automatic stay in order to preserve whatever value may exist in The Square's bankruptcy estate and to provide for its orderly liquidation.[12]

Although not specifically articulated, The Square asserts as part of its bad faith argument the factors considered by a court when analyzing whether § 305 abstention is appropriate in a bankruptcy case. Generally, abstention under § 305 is considered separate and apart from any analysis of an involuntary petition under § 303, but because The Square raises the issue as part of its allegation of First United's bad faith, the court considers the argument as it relates to the bad faith analysis.

In that regard, the Square directs the court to several cases, including this court's decision in *In re Watson*, No. 10-1292, 2010 WL 4497477 (Bankr.N.D.W.Va. Nov. 1, 2010), to support its argument that the filing of a bankruptcy case as a "litigation tactic" evidences bad faith. Those cases, however, are inapposite to this case. *Watson* involved a voluntary Chapter 7 filing by a consumer debtor that was essentially a one-creditor dispute aimed solely at avoiding the repayment of any amount purportedly due on the debtor's obligation to his largest creditor when the debtor had means to pay his creditors in full.

---

[11] Upon the filing of this involuntary petition, the City filed a motion for relief from stay so that it could move to terminate the Ground Lease based on The Square's default in failing to build the parking structure by the April 1, 2011 deadline. The Square did not contest the motion for relief from stay, but First United subsequently filed an adversary proceeding in this case based on its belief that it is secured in the Ground Lease. The City and First United agreed to stay those proceedings until disposition of the involuntary petition.

[12] The U.S. District Court found on page eleven of its decision granting the appointment of a receiver that:

> In connection with this loan transaction, First United purportedly received [The Square's] interest in the Ground Lease as security for its obligations as a guarantor. Based on the inaction of [The Square], however, First United faces the loss of that security, the only remaining collateral not subject to the various Warner bankruptcies.

Order adopting-in-part Report and Recommendation of Magistrate Judge Kaul (Doc. No. 26 in 1:11-cv-00031-IMK-JSK).

9

Likewise, the court finds *In re Macke Intern. Trade, Inc.*, 370 B.R. 236 (B.A.P. 9th Cir. 2007) unpersuasive because it involved the dismissal of an involuntary petition under § 305 of the Bankruptcy Code where, among other things, there was an absence of a bankruptcy purpose to reorganize, there was pending litigation in another forum, and another forum would be more appropriate for the resolution of any lingering dispute between the parties.

Here, however, there is a valid bankruptcy purpose to be served by a Chapter 7 case. The Square has no business purpose outside bankruptcy; it is insolvent and incapable of achieving its business objectives. But there may be value to be salvaged through bankruptcy. The Chapter 7 process allows for leveraging a potential return to creditors through the administration of this bankruptcy estate and the bankruptcy estates of related entities — all of which involve First United as a creditor — by a common trustee who can take advantage of a structured liquidation of The Square's assets.[13] Also, although the parties are involved in the pending district court litigation, the district court has already ruled that a receiver was appropriate in that case to wind up the affairs of The Square, which is quite similar to the purpose of a Chapter 7 bankruptcy, such that the court does not believe abstention under § 305 is appropriate. A creditor's election to proceed by way of bankruptcy as opposed to the use of receivership is not irrational or unreasonable; in fact, it may provide a more efficient forum in which to wind down the financial affairs of the debtor.

Moreover, abstention under § 305 requires that a court must avoid balancing the harm to the debtor versus the harm to creditors and focusing merely on whether one party will be better served than another by the exercise of abstention. Instead, the court must find that both parties will be served by abstaining. *In re Smith*, 415 B.R. 222, 238 (Banrk.N.D.Tex. 2009) ("[R]ather, the interests of *both* the debtor and its creditors must be served by [abstaining under § 305].")(emphasis added). Here, although The Square asserts that the court should abstain in this matter because it is merely a two-party dispute that is already pending in district court, it has failed to show how it and First United would both be better served by the court abstaining from entering an order for relief. In fact, it appears to the court that First United is better served adjudicating its rights in this court because

---

[13] Even if a trustee were not common to all of the related bankruptcy estates, it likely would be in the interest of each trustee to cooperate and coordinate their efforts, insofar as possible, in order to maximize the return to each estate.

10

it can take advantage of the automatic stay and any potential assets a Chapter 7 trustee may be able to administer,[14] and The Square is in no better a position if the court abstains because a receiver has already been ordered in the district court action such that The Square has no further viability as a going concern.

References by The Square to the cases of *In re Knedlik*, Nos. WW-08-1011-KuKJu and 07-15547, 2008 WL 8444815 (B.A.P. 9th Cir. June 30, 2008) and *In re Hatcher*, 218 B.R. 441 (B.A.P. 8th Cir. 1998) are unpersuasive because they involve instances where debtors abused the bankruptcy process to stay secured creditors. In fact, *Hatcher* was not an involuntary proceeding but a voluntary Chapter 11 filing that was dismissed under § 1112(b) for lack of good faith, and *Knedlik* involved a nefarious debtor who attempted to forestall his creditors by using his mother in order to obtain relief under the Bankruptcy Code by enlisting her to file, not just one, but several involuntary petitions against him. Thus, the factual background of each of those cases is markedly different from the case currently before the court.

Finally, *In re Grossinger*, 268 B.R. 386 (Bankr. S.D.N.Y. 2001) is of no avail to The Square's argument. It involved the filing of an involuntary petition by a creditor of the debtor who had a simple, nominal claim that the creditor should have pursued in state court. In that case, the court noted that, "[t]o use an involuntary filing as a tactic to work it out with one's alleged obligor is an abuse of the bankruptcy process . . . ." *Id.* at 389. Again, this case is unpersuasive given the factual disparity between it and the instant case.

In sum, because involuntary petitions are presumed to be filed in good faith, and given the paucity of The Square's evidence offered to rebut the presumption that the involuntary petition was filed in good faith, consideration of the totality of the circumstances – on both objective and subjective counts – fail to show that the involuntary petition was filed in bad faith.

### III. CONCLUSION

First United has established its standing under § 303(b)(2) to bring this involuntary petition

---

[14] Notably, the interim trustee continued The Square's operation of a parking lot on the property that it the subject of the Ground Lease with the City of Morgantown. Based on evidence adduced at the evidentiary hearing on this matter, the trustee has been able to increase The Square's cash flow from the parking lot, and has substantial cash on hand to administer in an involuntary Chapter 7 estate.

11

against The Square, as well as grounds for relief under § 303(h). An order for relief under Chapter 7 of the Bankruptcy Code, therefore, is granted.

    The court will enter a separate order consistent with this memorandum opinion.